IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| UTE DISTRIBUTION CORPORATION, a Utah Corporation, | **MEMORANDUM OPINION AND ORDER** |
| Plaintiff/ Appellant, | |
| vs. | Judge Dee Benson |
| SECRETARY OF THE INTERIOR OF THE UNITED STATES, in his official capacity; and agents and employees, and those working in concert with him, | Case No.: 2:95-CV-376 |
| Defendants/ Appellees, | |
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, | |
| Defendant Intervener/ Appellee, | |
| and RED ROCK CORPORATION, a Utah Corporation | |
| Defendant-Intervener. | |

This case arises out of the Secretary of the Interior's determination that tribal water rights of the Ute Indian Tribe were divided and distributed in 1961 pursuant to the Ute Partition and Termination Act ("UPA"). 25 U.S.C. §§ 677 *et seq.* Plaintiff Ute Distribution Corporation ("UDC") has appealed the Secretary's decision, and the issue is now before the Court pursuant to the judicial review procedures of the Administrative Procedures Act ("APA"). 5 U.S.C. § 701, *et seq.*

**Factual Background**

In the 1950s, Congress initiated a policy now known as the "termination era," during which Congress sought to terminate federal recognition of Indian tribes and assimilate tribal members into the general population by passing a series of termination statutes. *See generally*, Cohen's Handbook of Federal Indian Law, § 1.06 (2005 ed.). The UPA was one such statute. 25 U.S.C. §§ 677 *et seq*. It established a process to terminate federal supervision over the so-called "mixed-blood" members of the Ute Indian Tribe.[1] Through the UPA, Congress provided for the partition and distribution of the assets of the Ute Indian Tribe between the full-blood group, for whom federal supervision would continue, and the mixed-blood group, for whom such supervision would end. *Id.*

One of the first steps in this process was the creation of a final membership roll dividing the two groups. 25 U.S.C. § 677g. The final membership roll was published on April 5, 1956, 21 Fed. Reg. 2208-12 (1956), and listed 1,314 full-bloods (72.84 % of the total group) and 490 mixed-bloods (27.16 % of the total). *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 135 n.5 (1972) ("*AUC I*"). Thereafter, the Ute Tribe consisted exclusively of the full-blood members. 25 U.S.C. §§ 677d and 677g.

---

[1]

Under the Partition Act, the "full-blood" group was comprised of those individuals with at least "one-half degree of Ute Indian blood and a total Indian blood in excess of one-half." 25 U.S.C. § 677a(b). The "mixed-blood" group was comprised of those individuals who either did not possess sufficient Indian or Ute Indian blood to qualify as "full-bloods" or who became a mixed-blood member by choice under section 677c after having been initially classified as a full-blood member. 25 U.S.C. §§ 677a(c), 677c.

*Hackford v. Babbitt*, 14 F.3d 1457, 1462 (10th Cir. 1994).

After the two groups were divided, section 10 of the UPA, 25 U.S.C. § 677i, required the division and distribution of tribal assets then susceptible to equitable and practicable distribution based upon the relative number of persons comprising each of the two groups. This section further provided that all assets not susceptible to equitable and practicable distribution – categorized as "[a]ll unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution" – were to be managed jointly by the Tribal Business Committee (representing the full-blood members) and the authorized representative of the mixed-blood group. 25 U.S.C. § 677i. The mixed-blood group created the Affiliated Ute Citizens of Utah ("AUC") to act as their authorized representative. 25 U.S.C. § 677e.

In October 1956, the AUC and the Tribal Business Committee agreed to and adopted criteria governing how the tribal assets were to be divided in the "Plan for Division of Assets" (the "Plan"). AR 127-36. The Plan identified those tribal assets the two groups agreed were then susceptible to equitable and practicable distribution and adopted a ratio of division pursuant to their numbers and section 10 of the UPA (72.84 % to the full-bloods and 27.16 % to the mixed-bloods). 25 U.S.C. § 677i. This ratio was then used to achieve a division of tribal assets, including loans and accounts receivables of the Tribe, materials, supplies, buildings, and equipment. Sections II-IX of the Plan for Division, AR 1352. Section X of the Plan memorialized the two groups' agreement with regard to the division of tribal land, including water, water rights, and potential water rights appurtenant to the land:

> All water and water rights pertinent to the lands involved or generally used in connection therewith whether represented by shares of stock in a corporation or otherwise and all potential water rights that may subsequently attach to the lands

to be divided shall be considered in arriving at the fair value of lands divided and
shall be considered as running with the land.

Plan for Division, Section X.F., AR 135.

In November 1956, the Secretary of the Interior, through the Acting Commissioner of the
Bureau of Indian Affairs ("BIA"), approved the Plan.  AR 138-44.  In approving the Plan, the
BIA specifically cautioned both groups to seek independent advice about dividing the lands,
stating: "we recommend to you, in fact urge you, to give serious consideration to the obtaining of
unimpeachable qualified independent advice in the matter of review of proposed plans for
division of the lands . . . covering your entire real estate partition."  AR 143.

The implementation of the Plan and final division of tribal assets was approved by the
AUC Board of Directors and the Ute Indian Tribe on December 18, 1957.  *See* AUC Resolution
No. 57-234, AR 1167-71;  Resolution No. 57-238, AR 1173-76.  The AUC Membership
approved the plan on January 10, 1958.  AUC Resolution No. 58-G2, AR 1179.  Each resolution
confirmed that the division of assets was "satisfactory, equitable, practicable and based upon the
relative number of persons comprising the final membership roll of each group."  AR 1169,
1174-75; *see also* AR 1179.  The division of assets between the two groups was approved by the
Commissioner of Indian Affairs on behalf of the Secretary on March 24, 1958, wherein he found
that the division was "made in a manner equitable to the two groups and within the legal
authority of the [Ute Partition] Act."  AR 1208-09.

Subsequent to the division of the tribal assets, the mixed-bloods were required to "devise
a plan for the distribution of its share of the tribal assets to the individual members of the mixed-
blood group."  *Hackford v. First Sec. Bank of Utah*, 521 F.Supp. 541, 544 (D. Utah 1981).  *See
also* 25 U.S.C. § 677l; Plan for Distribution, AR 147.  Pursuant to this plan, and in accordance

4

with the UPA, the AUC established three separate corporations to manage the mixed-bloods'

assets.  One of those corporations, the UDC, was created to

> manage jointly with the Tribal Business Committee . . . all unadjudicated or
> unliquidated claims against the United States, all gas, oil, and mineral rights
> of every kind, and all other assets not susceptible to equitable and practicable
> distribution to which the mixed-blood members of said tribe . . . are now, or may
> hereafter become entitled . . . and to receive the proceeds therefrom and to
> distribute the same to the stockholders of this corporation . . . .

UDC Articles of Incorporation (November 13, 1958), AR 654.  *See also* 25 U.S.C. § 677i.

Additionally, the AUC formed two separate non-profit grazing corporations ("Range

Corporations"), to maintain 172,000 acres of former tribal range lands that now belonged

exclusively to the mixed-bloods.  *Hackford*, 521 F. Supp. at 544.  Each mixed-blood surrendered

his individual interest in the range lands in return for stock in the Range Corporations.  *Id*.  Fee

patents were then issued conveying the land to the Range Corporations together with "all the

rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging ...."

Fee Patents Issued to Range Corporations, AR 1261-74.  Only "minerals and mineral rights,

including all oil and gas together with the right to lease, extract and retain the same pursuant to

[the UPA]," were reserved from the conveyance as indivisible assets.  *Id*.  By May 1963,

however, the Tribe had purchased over 90% of the stock in the two Range Corporations and

subsequently dissolved both corporations pursuant to state law.  *Id*. at 548.

Shortly after obtaining final approval on the Plan for Distribution, the Ute Indian Tribe

and AUC jointly hired E.L. Decker to study and produce a report regarding the water rights of

the Reservation.  Both parties understood that distribution of the lands could not be fully

completed until all irrigation problems were solved.  *See* Tribe's Resolution No. 58-231 (Oct. 14,

1958), AR 2724.  Accordingly, Mr. Decker prepared a report, which was completed on

December 12, 1960, identifying all practicably irrigable acreage ("PIA") within the Reservation, and used this as the basis for quantifying the tribal reserved water rights. *See* Decker Report (Dec. 12, 1960), AR 693-831.

Thereafter, on August 26, 1961, the Secretary completed the termination of the mixed-blood group, proclaiming that:

> the federal trust relationship to such individual [mixed-blood] is terminated and that effective midnight, August 27, 1961, such individual shall not be entitled to any of the services performed for Indians because of his status as an Indian. All statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to such member over which supervision has been terminated, and the laws of the several states shall apply to such members in the same manner as they apply to other citizens within their jurisdiction.

Termination Proclamation, 26 Fed. Reg. 8042 (August 26, 1961), AR 1432. *Accord* 25 U.S.C. § 677v.

In 1965, four years after termination of the mixed-blood group was complete, the Ute Indian Tribe entered into an agreement with the United States and the Central Utah Water Conservancy District ("CUWCD"), whereby the Tribe agreed to defer irrigating 15,242 acres of tribal land. The land at issue was previously classified as "range land" and had been included in the division of assets among the mixed-bloods and full-bloods.[2] In exchange, the United States and CUWCD agreed to construct water conveyance facilities that would ultimately deliver water to Ute Indian tribal lands from the Green River. Deferral Agreement (Sept. 20, 1965), AR 1067-1106. Neither the UDC nor any other authorized representative of the mixed-bloods was a party to this agreement.

---

[2]Some of the deferred lands had been owned by the Range Corporations but, as explained above, by 1965 were owned and controlled by the Tribe. *See supra* p. 5.

In 1969, the AUC filed *Affiliated Ute Citizens v. United States*, 199 Ct. Cl. 1004 (Ct. Cl. 1972), seeking compensation from the United States for certain assets, including water rights, that they alleged were not properly conveyed to the mixed-bloods pursuant to the UPA.  During this litigation the United States took the position that "the reserved water rights were divided between the mixed and full-blood groups by August, 1961," and that such water rights were appurtenant to the lands divided and distributed to the mixed-blood group.  Defendant's Brief in Opposition to Plaintiffs' Cross-Motion for Summary Judgment and Reply Brief to Plaintiffs' Opposition, *Affiliated Ute Citizens v. United States*, No. 156-69, at 4-5 and 9-10 (May 16, 1977), AR 3113-14 and 3118-19. Ultimately, the court agreed, holding that "[t]he division and distribution of assets of which plaintiffs complain were effected by 1961, all intangible assets being conveyed either in the form of shares in the [UDC] or as appurtenant to land." *Affiliated Ute Citizens v. United States*, 215 Ct. Cl. 935, 935 (Ct. Cl. 1977).

The Tribe and the United States have repeatedly taken the position that Ute Tribal water rights run appurtenant to tribal land and that such water rights are owned exclusively by the Tribe – not in trust as the UDC contends.  In 1980 and 1990, the Ute Indian Tribe and the United States negotiated a compact to specifically quantify the reserved water rights for the tribal land. Ute Indian Water Compact (1980), AR 892-970; Ute Indian Water Compact (1990), AR 973-1045.[3]  Again, the UDC was not a party to either agreement.

---

[3]Neither Compact has been fully approved.  The 1980 version was ratified by Utah and codified in Title 73 of the Utah Code.  The 1990 version was ratified and approved by Congress in 1992, Ute Indian Rights Settlement, Pub. L. No. 102-575, 106 Stat. 4650, 4652 (1992), AR 834-39, but has not yet been approved by either the State or Tribe.

## Procedural History

The present litigation, brought by the UDC in 1995, seeks a declaratory judgment that the tribal water rights were not divided and distributed in 1961; "that they remain in trust for the benefit of mixed-blood and full-blood members of the Tribe; and that they are subject to joint management by the UDC and the Tribal Business Committee." *Ute Distribution Corp. v. Secretary of the Interior*, 934 F. Supp. 1302, 1306 (D. Utah 1996).  In 1997, this Court issued an Order remanding the water rights issue to the Secretary of the Interior for "final action and decision."  Order, March 5, 1997, Dkt. No. 61, AR 49-51.  After reviewing the UPA, the Plan for Division, and all other records associated with the mixed-bloods termination, the Secretary issued a decision on October 2, 1998, finding that the tribal water rights of the Ute Indian Tribe were an asset susceptible to equitable and practicable distribution and that they were in fact divided and distributed as appurtenant to the land in 1961 pursuant to the UPA.  Secretary of the Interior's 1998 Decision at 5, AR 1353.

After the Secretary issued the 1998 Decision, the UDC asserted that the Secretary failed to provide them with access to relevant documents prior to her initial consideration of the issues. In response, the Court issued an Order on March 24, 2001 authorizing the parties to submit additional evidence and argument to the Secretary for further review and consideration.  Order, March 24, 2001, Dkt. No. 148, AR 1577-78.  On February 8, 2004, the Secretary issued a second decision, affirming the 1998 Decision, explaining that the UDC provided "no evidence to rebut the clear language of the Plan for Division . . . which reflects [the mixed and full-bloods] intent to divide and distribute 'all water rights pertinent to the lands involved . . . and all potential water

rights that may subsequently attach to the lands divided . . . ."  Secretary of the Interior's 2004

Decision at 4, AR 1311-26 (quoting the Plan for Division, Section X.F., AR 135).

Following the 2004 Decision, the UDC filed a Second Amended Complaint, Dkt. No.

177, which the Tribe and the Secretary moved to dismiss, Dkt. No. 184.  On April 19, 2006, the

Court issued an Order denying Defendants' motion to dismiss and holding that the Court would

address the UDC's first claim for relief in its Second Amended Complaint by reviewing the

Secretary's Decisions pursuant to the judicial review procedures of the Administrative

Procedures Act ("APA"), 5 U.S.C. §§ 701, *et seq*.  Order, April 19, 2006, Dkt. No. 211.  Claims

Two through Six, however, including the UDC's claim for declaratory judgment, were stayed

pending resolution of the administrative appeal.  Accordingly, the only claim presently before

the Court  is the administrative appeal of the Secretary's decision.

## Analysis

The issue before the Court, which the Secretary of the Interior has already examined, is

"whether [the] tribal water rights in question were or were not an asset susceptible to equitable

and practicable distribution, and, if susceptible, whether the water rights were divided and

distributed as between the full-blood and mixed-blood groups . . . ."  Order, March 24, 2001,

Dkt. No. 148.  The UDC contends that not only were the water rights not divided and distributed

in 1961, but they could not be.  By definition, the UDC argues, tribal reserved water rights are

not an asset susceptible to practicable and equitable distribution and, therefore, could not be

divided under the UPA.  25 U.S.C. § 677i.  Furthermore, the UPA only authorized the Secretary

to approve the agreed upon division of assets between the mixed-blood and full-blood groups, it

did not give the Secretary the authority to adjudicate which assets were susceptible to division,

nor did it give the Secretary the authority to interpret the Plan for Division and determine which assets were actually divided. Therefore, the UDC argues that the Secretary's determination that the water rights were divided in 1961 exceeds the Secretary's administrative authority and is null and void.

The Defendants respond that the plain language of the UPA, the Plan for Division, the Plan for Distribution, and the conduct of the parties all demonstrate that the tribal water rights were divided in 1961. The Secretary's 1998 and 2004 decisions further support this conclusion and are squarely within the authority provided to the Secretary by the UPA. Not only did the UPA make the validity of the Plan for Division subject to the Secretary's approval, it also gave the Secretary the authority to divide tribal assets where agreement could not be reached. *Id*. Implicit in this, Defendants argue, is the ability to determine which assets were subject to division and which assets were divided.

The Defendants also contend that while the Secretary had the authority to determine what happened in 1961, this Court is without jurisdiction to review that determination. Section 2401(a) of Title 28 requires that every civil action against the United States must be brought "within six years after the right of action first accrues." Because this statute of limitations has been found to be jurisdictional, Defendants argue that this Court lacks jurisdiction to review what occurred in 1961 and, therefore, the case must be dismissed.

I.        **Implementation of the UPA: 1956 - 1961**

The Act of Congress anticipated that water rights would be divided among the mixed-bloods and full-bloods and, therefore, were an asset "susceptible to equitable and practicable distribution." 25 U.S.C. § 677i. In section 13 of the UPA, Congress directed the mixed-bloods

10

to prepare a Plan for Distribution of the divided tribal assets, specifically including "the handling of water and water rights." *Id*. § 677l.

In implementing the UPA, the parties followed this directive from Congress and did in fact divide the tribal water rights. The Plan for Division, which was drafted jointly by both parties, specifically referenced the inclusion of water or water rights in the evaluation and division of tribal assets. Section X.F. of the Plan for Division, entitled "Water Rights," provided:

> All water and water rights pertinent to the lands involved or generally used in connection therewith whether represented by shares of stock in a corporation or otherwise and all potential water rights that may subsequently attach to the lands to be divided shall be considered in arriving at the fair value of the lands divided and shall be considered as running with the land.

AR 135. A clearer statement of intent to divide the reserved water rights with the lands to be divided can hardly be imagined. The parties' agreement unquestionably demonstrates their awareness and understanding that: a) the water rights could be divided; b) there were "potential water rights," not yet quantified, that might someday attach to the lands then being divided; and c) that it was fair and equitable to divide the water rights, including potential water rights, with the lands described.[4]

The Plan for Distribution, which was prepared exclusively by the mixed-bloods, further provided for the handling of water rights. It specifically stated:

---

[4]Moreover, the Summary of the Division of Assets, which sets out parcel by parcel lands that were to be transferred or purchased by both the mixed-bloods and full-bloods, demonstrates that water rights were considered as appurtenant to the lands being divided. It identifies the value of each parcel, showing that those parcels where a water right attached were considerably more valuable than those with no such right. Summary of Division of Assets, AR 362-409.

> If the property distributed to the mixed blood group requires the organization of irrigation companies in order to provide for an equitable or advantageous distribution of water, such companies shall be organized prior to the transfer of water rights and the land to be irrigated.

Plan for Distribution, Section VIII, AR 161.  Thus, in 1956 the mixed-bloods understood that the division of assets included the distribution of water rights, and that these water rights were to be distributed with the land, including some land that was yet to be irrigated.

In approving the division of tribal assets in 1958 and later effectuating it through termination in 1961, the Secretary did everything the Act required of him.  But because there were no disputes regarding the division of assets, no decision was ever explicitly made by the Secretary regarding the susceptibility of water rights to equitable distribution.  It is on this basis that the UDC has brought the present action seeking a declaratory judgment.  The UDC argues that with no affirmative declaration by the Secretary in 1961 that tribal water rights were an asset susceptible to division and were in fact divided, it is entitled to know if the tribal reserved water rights were actually divided in 1961.

## II.    The Secretary's 1998 and 2004 Decisions

As previously explained, in 1997 the Court remanded the water rights issue to the Secretary of the Interior for final agency action and decision.  Order, March 5, 1997, Dkt. No. 61, AR 49-51.  After reviewing the record and receiving input from the parties, the Secretary ultimately determined that the tribal water rights of the Ute Indian Tribe were an asset susceptible to equitable and practicable distribution and that they were in fact divided and distributed as appurtenant to the land in 1961.  2004 Decision, AR 1311-26.

The Court, on April 19, 2006, determined that it would review the Secretary's decision pursuant to appellate review procedures of the Administrative Procedures Act ("APA").  5

U.S.C. § 706(2)(A)-(D).  Order, April 19, 2006, Dkt. No. 211.  The APA provides the courts

with jurisdiction to review final agency action.  5 U.S.C. § 704.  Section 706 of the APA

explains that this judicial review is deferential, with courts setting aside final agency action only

when it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  *Id*. at § 706(2)(A).  Section 706 further provides, however, that agency

action must be set aside when that action exceeds the agency's statutory authority.  *Id*. at §

706(2)(C).

     The UDC now contends that none of the provisions of the UPA authorize the Secretary to

decide on the basis of the historical record what happened fifty years ago.  The Secretary's 1998

and 2004 decisions are plainly adjudications of what happened in the past, not initial

determinations of present agency action within the scope of the Secretary's statutory authority.

Accordingly, the UDC argues that the Secretary's action is a nullity.  Rather than review the

Secretary's decisions under the standards of appellate review, the UDC argues that the Court

should review this issue de novo following appropriate presentation of the evidence.

     But the UPA expressly provides that the Secretary had the authority to make any division

of assets which might have become necessary if the two groups could not agree.  *Id*. at 677i.

Similarly, § 677aa provides that when an agreement is required by the two groups that cannot be

reached, "the Secretary is authorized to proceed in any manner deemed by him to be in the best

interests of both groups."  *Id*. at § 677aa.  These provisions make clear that the Secretary has

more authority under the UPA than just that necessary to approve the division of assets agreed

upon between the full-bloods and mixed-bloods.  Finally, if the Secretary had the authority to

resolve disputes in 1961, undoubtedly he has the authority to do so now.

The Court finds that to the extent the Secretary did not specifically address the water rights issue in 1961,[5] the Court's 1997 remand to the Secretary to determine which assets were susceptible to equitable distribution and to determine which assets were actually divided was proper and was within the statutory authority of the UPA. The Court's review of that decision, therefore, should be deferential, applying an "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). But under either standard of review, whether it be de novo or arbitrary and capricious, the Court reaches the same conclusion. Therefore, the Court will address the issue under both standards.

### A.      De Novo Review

A complete review of the administrative record, giving no deference to the recent decisions of the Secretary, demonstrates that the tribal reserved water rights of the Ute Indian Tribe were both an asset susceptible to equitable distribution and were in fact divided in 1961.

### 1.      Susceptibility of Water Rights to Equitable Distribution in 1961

The UDC argues that in 1961 the tribal water rights were of an unknown quantity and thus by definition could not have been susceptible to equitable distribution. *See* 25 U.S.C. § 677i. In 1961, it was generally understood that when Indian tribes reserved a portion of their lands by treaty they impliedly reserved a water right sufficient for the reservation. *Winters v. United States*, 207 U.S. 564, 577 (1908). These reserved water rights – which are often referred

---

[5]At a hearing in 1996 before Judge Winder, the Secretary's attorney explained that the United States' position was that the issue "has never been presented to the United States in a way that the resources and expertise of the Secretary in particular in Indian matters and specifically within the administration of this act has been brought to bear" and that "it's our position essentially that the Secretary has not made a final determination." (Tr. of December 17, 1996 Hrg., pp. 6-8).

to as *Winters* water rights – had no fixed quantity, no fixed place of use, and no risk of forfeiture

for non-use.  They simply reserved for Indians enough water to sustain the Reservation.

It was not until 1963 – long after the division of the Ute Range Lands – in the case of

*Arizona v. California*, 373 U.S. 546 (1963), that the United States Supreme Court defined the

scope and extent of Indian reserved water rights.  In *Arizona v. California*, the Supreme Court

was forced to determine the water rights belonging to Indian tribes along the Colorado River.

Competing water users contended that the Indian reserved water rights should be limited only to

amounts likely to be needed by the sparse Indian populations.  The Supreme Court, however,

ruled that the tribes were entitled to enough water to irrigate all the practicably irrigable acreage

("PIA") on the reservation, thereby finally annunciating a means to quantify *Winters* water

rights.  *Id*. at 600-01.

The UDC contends, that given the uncertainty surrounding the legal standards to be

applied in determining the extent of Indian reserved water rights in 1961, the Tribal water rights

could not have been an asset susceptible to equitable distribution as required by the UPA.

Equitable division requires some level of certainty so that assets can be quantified and valued.

But by 1956, when the mixed-bloods and full-bloods agreed to divide the Tribe's water

asset, the nature and scope of *Winters* reserved water rights "was well recognized."  *United*

*States v. Adair*, 723 F.2d 1394, 1412 n.21.[6]  For example, as early as 1928, the federal district

---

[6]*Conrad Investment Co. v. United States*, 161 F. 829, 831-32 (9th Cir. 1908) (finding an
Indian reserved water right "to the extent reasonably necessary for the purposes of irrigation and
stock raising, and domestic and other useful purposes"); *Skeem v. United States*, 273 F.93, 95
(9th Cir. 1921) (explaining that the reserved water right pertained not only to those lands
currently cultivated by the Indians, but also to those lands that would be cultivated in the future);
*United States ex rel. Ray v. Hibner*, 27 F.2d 909 (D. Idaho 1928); *Anderson v. Spear-Morgan
Livestock Co.*, 79 P.2d 667, 669 (Mont. 1938) ("This [water] right is appurtenant to the land

court in *United States v. Hibner* held that under *Winters*, Indian reserved water rights consisted of as much water as was required "for the irrigation of that portion of their lands which the evidence discloses is susceptible to irrigation" (i.e. PIA).  *United States ex rel. Ray v. Hibner*, 27 F.2d 909, 911 (D. Idaho 1928).  *Hibner* further held that purchasers of Indian land acquired "the same character of water right with equal priority as of those of the Indians," except that their water right, unlike the Indians, was subject to forfeiture for non-use.  *Id*. at 912.

This position was upheld in 1939 by the United States Supreme Court in *United States v. Powers*, 305 U.S. 527 (1939).  In addressing a similar issue, the Court held "that when allotments of [Indian] land were duly made for exclusive use and thereafter conveyed in fee, the right to use some portion of tribal waters essential for cultivation passed to the owners."  *Id*. at 532.  Additionally, *Arizona v. California* was filed in 1952, and the United States intervened in 1953 arguing on behalf of the five Indian tribes that reserved water rights should be measured by PIA.

Thus, by 1956 when the full-bloods and mixed-bloods began their division of tribal assets under the UPA, there was an established body of case law supporting the principle that reserved water rights under *Winters*, ran with and were viewed as appurtenant to the irrigable reservation lands and that said reserved water rights were susceptible to be divided with such reservation lands, even though not measured or quantified as to amount.  Although the Supreme Court did not confirm the PIA standard until 1963 in *Arizona v. California*, lower courts had consistently

---

upon which it is to be used by the allottee. . . . [A] conveyance of the land, in the absence of contrary intention, would operate to convey the right to use the water as an appurtenance."); *Lewis v. Hanson*, 227 P.2d 70, 72 (Mont. 1951) ("Upon conveyance of the land by an Indian, the water right passes to the grantee as an appurtenance unless a contrary intention appears.").

been recognizing *Winters* rights based on agricultural purposes and their relationship to irrigable lands for years.

The language of the UPA, the Plan for Division, and the Plan for Distribution all anticipated that water rights would be included in the division of tribal assets. The idea that reserved Winter rights could be equitably divided as appurtenant to land in 1961 was adequately supported by the case law as it existed at the time of partition. Therefore, upon a de novo review of the record, the Court finds that the tribal water rights were an asset susceptible to equitable and practicable distribution in 1961.

**2.      Division and Distribution of Water Rights in 1961**

As detailed above, the plain language of the UPA and its implementing documents demonstrate that both Congress and the parties envisioned that the Tribe's water rights would be part of the assets divided under the UPA. A review of the parties' conduct during and after termination provides even further support for this position.

When the range lands were distributed under the UPA to the Range Corporations for the benefit of the mixed-bloods, the agreements explicitly stated that the lands were being conveyed "together with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging." AR 1261 and 1262. The only assets the agreements retained, to be held in joint management pursuant to the UPA, were "all minerals and mineral rights, including oil and gas." *Id.* Water rights were not mentioned.

The Decker Report, which was commissioned by both the full-bloods and the mixed-bloods, further confirms that in 1961 the two groups understood that the tribal water rights ran with the land being divided. It identified PIA as the basis for quantifying the reserved tribal

water rights and was prepared to assist the parties in the irrigation of the divided lands.  Decker

Report (Dec. 12, 1960), AR 693-831.

In 1965, the full-bloods entered into an agreement with the United States whereby they

agreed to defer the irrigation of 15,242 acres of their land.  Deferral Agreement (September 20,

1965), AR 1067-1106.  In essence, this meant that the full-bloods were temporarily relinquishing

a portion of their tribal water rights.  The mixed-bloods were neither a party to this agreement

nor were they ever consulted.  Then again in 1980 and 1990, the full-bloods negotiated a

compact with the United States to specifically quantify the reserved water rights for their tribal

land.  Again, the mixed-bloods were not a party to these negotiations.

In 1971, during litigation between the two groups involving similar issues,  *Affiliated Ute*

*Citizens v. United States*, 215 Ct. Cl. 935 (Ct. Cl. 1977), the mixed-bloods and full-bloods

entered into a stipulation as to what occurred in the implementation of the Plan for Division.  In

this stipulation, the parties agreed that section X of the Plan for Division covered "the division of

land, timber and water rights."  Stipulation Summarizing Implementation of Plan for Division of

Assets at 4 (January 7, 1971), AR 348 - 57.  Thus, the conduct of the parties both during

termination and after is a clear indication that the parties did in fact divide and distribute the

tribal reserved water rights with the land in 1961.

The UDC argues, however, that if the tribal water rights had been divided in 1961 as

appurtenant to the range lands, then one would expect those water right claims to be substantially

the same today.  Instead, they are substantially different.  For example in 1980, as part of an

overall proposed settlement of water rights on the Reservation, the Tribe began negotiating with

the United States for a 10,000 acre-foot municipal and industrial water right.  Ute Indian Water

18

Compact (1980), AR 892-970.  This claim is not based upon irrigation and is not related to any

particular land.  Rather, it is in addition to the irrigation acreage and is designated to meet the

municipal, commercial, and industrial needs of the Tribe and reservation residents.  *See id*.  *See*

*also* Ute Indian Water Compact (1990), AR 973-1045.[7]  The UDC argues, therefore, that because

this water right was not considered at the time of division, it could not have been divided and

thus remains in trust.

But this municipal and industrial water right was a water right that the two groups

anticipated and provided for in the Plan for Division.  It is a "potential water right that may

subsequently attach to the lands [that were] divided."  Plan for Division, AR 135.  The parties

determined in 1961 that all of the Tribe's water and water rights, including a subsequently

negotiated for potential municipal and industrial water right, were divisible and would be divided

in accordance with the UPA.[8]

The overwhelming evidence supports the conclusion that the tribal reserved water rights

were an asset susceptible to equitable and practicable distribution and were distributed in 1961.

The plain language of the UPA and the terms of the implementing documents demonstrate the

parties' intent to so distribute the tribal water asset and the case law as it existed at the time of

partition supports the idea that reserved water rights could be equitably divided.  Furthermore,

---

[7]As has been explained previously, neither the 1980 Compact nor the 1990 Compact has been fully approved.  *See* supra note 3, at 7.

[8]The UDC makes the same argument with regard to the range lands, specifically that the claims to reserved water rights on the range lands today only remotely resemble the claims postulated by Decker in his 1960 Report.  But the parties agreed to divide "[a]ll water and water rights . . . and all potential water rights," clearly understanding that the source of the water rights for the range lands might change over time.  Plan for Division, Section X.F., AR 135.

since termination occurred in 1961, both groups have acted consistent with the understanding

that the tribal water rights were divisible assets that ran with the land previously divided.

Accordingly, after a complete review of the facts and the administrative record, giving no

deference to the Secretary's recent decisions, the Court finds that the tribal reserved water rights

were both an asset susceptible to equitable and practicable distribution in 1961 and were in fact

divided.

**B.       Arbitrary and Capricious Review**

To be upheld under the arbitrary and capricious standard, agency decisions must

demonstrate a "rational connection between the facts found and the decisions made."

*Olenhouse*, 42 F.3d at 1574.  The scope of this review is narrow – confined to "ascertaining

whether the agency examined the relevant data and articulated a satisfactory explanation for its

decision." *Colorado Wild, Heartwood v. United States Forest Service*, 435 F.3d 1204, 1213

(10th Cir. 2006).  Having found that the tribal water rights were an asset susceptible to equitable

distribution and were in fact divided under a de novo review, the Secretary's decision is easily

upheld under this deferential standard.  The Secretary referenced throughout his decisions the

most relevant data pertaining to the UPA and its implementation and clearly articulated the

reasons for his findings.  The Secretary's Decision is supported by "substantial evidence" and,

therefore, must be upheld.  *Olenhouse*, 42 F.3d at 1576.[9]

---

[9]"Evidence is generally substantial under the APA if it is enough to justify, if the trial
were to a jury, refusal to direct a verdict on a factual conclusion."  *Colorado Wild, Heartwood v.
United States Forest Service*, 435 F.3d 1204, 1213 (10th Cir. 2006) (quoting *Hoyl v. Babbitt*, 129
F.3d 1377, 1383 (10th Cir. 1997)).

**III.     Jurisdiction**

Both parties agree that the Court has jurisdiction under the APA to review final agency action.  5 U.S.C. § 704.  The Defendants contend, however, that for such jurisdiction to persist, the request for review must be timely raised.  Section 2401(a) of Title 28 provides that: "[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  Accordingly, because final agency action occurred in 1961, the Defendants argue that the statute of limitations has long since expired and this Court is barred from review.  *See Block v. North Dakota*, 461 U.S. 273, 287 (1983) ("When waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity."); *Felter v. Norton*, 412 F. Supp. 2d 118, 124 (D.D.C. 2006) (finding that § 2401(a) is a jurisdictional bar to claims for review of agency informal rulemaking).

The UDC responds that the present litigation is not challenging what was done in 1961. Rather, it seeks a declaration *describing* what was done – whether the water rights were divided in 1961, or whether they remain in joint management by the Tribe and the UDC.  The UDC argues, therefore, that the Defendants' statute of limitations argument is circular.  It depends on the proposition that the water rights claims at issue were distributed in 1961, which is the core issue in this case.

Although the Court finds the Defendants' argument that the parties' actions both during and after partition put the UDC on notice that the tribal reserved water rights were divided in 1961 compelling, the statute of limitations issue has previously been decided in this case.  In 1996, Judge Winder held that:

> [T]here is no single, discrete event associated withe UPA that has given rise to a cause of action and triggered any attendant limitations period foreclosing this action. . . . [I]f this court were to conclude that certain tribal water rights were not partitioned and are an indivisible asset, then the Ute Tribre and the Secretary of the Interior would each be found to have an ongoing duty to ensure the UDC was properly included at all times in the joint management of that asset. Thus any breach at any time of the continuing responsibility of the Secretary or the Tribe could trigger a cause of action; hence, a declaratory judgment defining a party's rights under the UPA may properly be sought at any time while the federally supervised joint management scheme is in effect.

Order, July 26, 1996, Dkt. No. 33; also published at 934 F. Supp. 1302 (D. Utah 1996) (reversed on other grounds). Accordingly, this is the law of the case – which the Court has upheld throughout the litigation – and the Court finds no reason to disturb it now. *See* Order, March 5, 1997, Dkt. No. 61 (remanding the water rights issue to the Secretary of the Interior "for final action and decision"); Order, March 24, 2001, Dkt. No. 148 (reiterating that review of the Secretary's final decision would "proceed under the provisions of the APA applicable to the review of final agency action"). Therefore, the Court finds that the statute of limitations imposed by 28 U.S.C. § 2401 is not a bar to this Court's jurisdiction to review the final agency action at issue.

### Conclusion

For the foregoing reasons, the Court finds that the tribal reserved water rights of the Ute Indian Tribe were both an asset susceptible to equitable and practicable distribution in 1961 and were in fact divided. Although the Court finds that the Secretary's recent decisions are within the statutory authority provided under the UPA and is thus entitled to deference, under either standard of review, whether it be de novo or arbitrary and capricious, the conclusion is the same. The Secretary's decision is AFFIRMED.

IT IS SO ORDERED.


DATED this 2nd day of June, 2008.



_____
Dee Benson
United States District Judge